# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In the matter of:

CMC Telecom, Inc.,

               Debtor

_____/

Case No. 07-56001-MBM
Chapter 11
Hon. Marci B. McIvor

Whitmore Lake Public Schools,

               Plaintiff,

v.

CMC Telecom, Inc.,

               Defendant

_____/

Adv. Pro. No. 07-6556

Howell Public Schools,

               Plaintiff,

v.

CMC Telecom, Inc.,

               Defendant.

_____/

Adv. Pro. No. 07-6557

Greenville Public Schools,

               Plaintiff,

v.

CMC Telecom, Inc.,

               Defendant.

_____/

Adv. Pro. No. 07-6558

Van Dyke Public Schools,

        Plaintiff,

v.                                  Adv. Pro. No. 07-6559

CMC Telecom, Inc.

        Defendant.
_____/

Oxford Area Community Schools,

        Plaintiff,

v.                                  Adv. Pro. No. 07-6567

CMC Telecom, Inc.

        Defendant.
_____/

### **\*\*AMENDED\*\* OPINION GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on Plaintiffs' Motions for Summary Judgment. Plaintiffs are schools districts seeking to recover funds held by debtor/defendant CMC Telecom, Inc. Plaintiffs contend that the funds belong to the school districts and are not property of Debtor's bankruptcy estate. Plaintiffs each filed a five-count adversary complaint seeking return of the funds plus damages. The Complaints are identical except for the amounts sought to be recovered by each Plaintiff. Specifically, the Complaints allege that Debtor converted the funds in violation of Mich. Comp. Laws § 600.2919a (Count I), appropriated the funds through fraud, embezzlement, or larceny (Counts IV and V), and violated fiduciary duties owed to Plaintiffs (Count III). Alternatively, Plaintiffs allege that the funds are not property of the estate and seek return of the funds as a matter of equity (Count II).

Plaintiffs' Motions for Summary Judgment share common facts (except for the amounts allegedly owed to each school district), and the legal issues are identical in each case. Thus, this Opinion is dispositive of all five Motions for Summary Judgment.

The Court finds that the funds sought by Plaintiffs are not property of Debtor's bankruptcy estate and must be returned to Plaintiffs. Summary judgment on Count II of the Complaint is, therefore, granted. There are no genuine issues of material fact regarding fraud, embezzlement, larceny, or breach of fiduciary duty. Summary judgment is granted in favor of Defendant on those claims, and Counts III, IV, and V are dismissed. Because there are genuine issues of material fact regarding conversion, summary judgment on Count I is denied.

## I. Facts

Debtor CMC Telecom, Inc. is a service provider under the Universal Service Fund Program established under the Telecommunications Act of 1996. Plaintiffs/movants Whitmore Lakes Public Schools, Howell Public Schools, Greenville Public Schools, Van Dyke Public Schools, and Oxford Area Community Schools utilized Debtor as their telecommunications service provider. Because the funds at issue involve money paid out of the Universal Service Fund ("USF"), a summary of the Telecommunications Act of 1996 and the USF is necessary in order to understand the parties' dealings and the nature of the payments in dispute.

The USF program is authorized by the federal government for the benefit of, among others, school districts. The Communications Act of 1934 first established the national policy of universal service: "[t]o make available, so far as possible, to all the people in the United States . . . a rapid, efficient, Nation-wide and world-wide wire and

radio communications service with adequate facilities at reasonable charges. . . ." (47

U.S.C. § 151). In the 1996 Telecommunication Act, Congress explicitly codified this

federal policy of universal service by adding § 254 to the Communications Act. Section

254, which was intended to ensure that access to the communications network is

affordable and ubiquitous, ratified the use of universal service funding to assist low

income consumers and consumers in high cost areas in obtaining affordable telephone

service. (47 U.S.C. §§ 254(b)). It also extended universal service support to schools,

libraries, and certain rural health care providers. (47 U.S.C. § 254(h)). Congress

placed the regulatory details of implementing § 254 in the hands of the Federal

Communications Commission ("FCC") and the Federal-State Joint Board on Universal

Service. (47 U.S.C. §§ 254(a) and (b)).

The Universal Services Administrative Company ("USAC") is a private, not-for-

profit corporation, organized under the laws of Delaware, that was created at the

direction of the FCC. The FCC has designated USAC, by federal regulation, as the

Administrator of the universal service support mechanisms established pursuant to the

1996 Act. (47 C.F.R. § 54.701).

USAC has been delegated the responsibility by the FCC to collect mandatory

contributions from telecommunications carriers to the Universal Service Fund and

distribute those funds in accordance with federal law and regulations. (47 C.F.R. §§

54.701-02). USAC's sole function is to administer the federal universal service support

mechanisms, including the E-Rate program. (47 C.F.R. §§ 54.701, 54.701, 65.705).

The E-Rate program provides Universal Service Funds to eligible telecommunications

service providers and non-telecommunications service providers that provide eligible

services to eligible schools, school districts and libraries (hereinafter "applicants") in the United States.  (47 C.F.R. §§ 54.501-54.503, 54.517).

Four service categories are funded by the E-Rate Program: telecommunications services, Internet access services, the internal connections necessary to permit eligible entities to access the Internet, and basic maintenance of internal connections.  (47 C.F.R. §§ 54.506, 54.507).  Eligible schools and libraries are entitled to discounted telecommunication services from telecommunication providers who participate in the E-Rate program.  Discounts funded by the E-Rate Program range from 20% to 90% of the costs of eligible services, depending on the level of poverty and the urban/rural status of the population served by the eligible entity.  (47 C.F.R. § 54.505).

Applicants apply for funding by submitting one or more FCC Form(s) 471 to USAC for each annual funding year for which they seek discounts.  (47 C.F.R. §§ 54.504(c), 54.507(d)) Each FCC Form 471 contains one or more Funding Request Numbers (FRNs). (Affidavit of Kristy Carroll, USAC's Deputy General Counsel, ¶ 7, hereinafter referred to as "Carroll Aff.").[1]  Each FRN requests funding in a certain amount for goods and/or services to be provided by a particular service provider. (Carroll Aff. ¶ 7).   After completing the review of the applicant's FCC Form 471, USAC issues one or more Funding Commitment Decision Letters (FCDLs) setting out USAC's decisions with respect to each of the applicant's separately identified funding requests. (Carroll Aff. ¶ 7).

Service providers may request disbursements from the USF in one of two ways.

---

[1]A copy of Ms. Carroll's affidavit is attached to each Plaintiff's Brief in Support of Motion for Summary Judgment.

5

USAC and a school may disburse their respective shares of the cost directly to the service provider, or, as in the case at bar, the applicant (i.e. the school district) may pay the entire bill and be reimbursed for the discounted amount by submitting, together with the service provider, FCC Form 472, a Billed Entity Applicant Reimbursement or BEAR form. (Carroll Aff. ¶ 10). FCC regulations and the structure of the E-Rate program do not allow USAC to return the discount amount directly to the applicant schools or libraries. (Carroll Aff. ¶ 10). This is because the Telecommunications Act and its regulations allow payments from the USF only to service providers. (Carroll Aff. ¶ 10; 47 C.F.R. § 54.501(a); 47 U.S.C. § 254(e)("[O]nly an eligible telecommunications carrier. . . shall be eligible to receive specific Federal universal service support"); 47 U.S.C. § 254(h)(1)(B)(authorizing E-Rate payments for "telecommunications carriers.")). Pursuant to statute, USAC must disburse the approved discounted amount on the BEAR Form to the service provider, who has already been paid in full by the school district or library. The service provider is then required to reimburse the applicant school or library.

FCC regulations require the service provider to remit the reimbursement to the applicant school district or library no later than 20 business days (formerly 10 business days) after receiving the reimbursement check, and prior to tendering or making use of the payment. (47 C.F.R. § 54.514(b); *see also* BEAR Form, FCC form 472). Specifically, each BEAR Form submitted to USAC for payment includes the following language:

> I certify that I am authorized to submit this Service Provider Acknowledgment for this Billed Reimbursement Form, and acknowledge to the best of my knowledge, information and belief, as follows:

A.   The service provider **must** remit the discount amount authorized by the fund administrator to the Billed Entity Applicant [the school district] who prepared and submitted this Billed Entity Applicant Reimbursement Form as soon as possible after the fund administrator's notification to the service provider of the amount of the approved discounts on this Billed Entity Applicant Reimbursement Form, but in no event later than 10 calendar days after receipt of the reimbursement payment from the fund administrator, subject to the restriction set forth in B below.

B.   The service provider **must** remit payment of the approved discount amount to the Billed Entity Applicant prior to tendering or making use of the payment issued by the Universal Service Administrative Company to the service provider of the approved discounts for the Billed Entity Applicant Reimbursement Form.

(Emphasis added).

In expanding the remittance time from 10 days to 20 days, the FCC explained:

> **BEAR payments are reimbursements for services that have already been provided to and paid for by a school or library.   The structure of the schools and libraries support mechanism necessitates that reimbursement must flow to the applicant through the services provider.  BEAR payments are not the property of the service provider, which has been paid in full.**  The Administrator has received many complaints about service providers failing to remit BEAR payments in a timely fashion or, in come cases, at all.  According to the Administrator, formalizing the remittance requirement in a rule would strengthen its ability to ensure compliance.  The majority of commenters found that 20 days is an appropriate period for remittance.  We therefore adopt a rule requiring a provide who receives a BEAR check from the Administrator to remit payment to the applicant within 20 days of receipt.  Because providers are already required to remit BEAR payments within a limited timeframe, and thus should not need to implement major billing system changes, this rule change, like other rule changes unless otherwise noted, will be effective upon publication in the Federal Register.

18 F.C.C.R.  9202, ¶ 51 (In the Matter of Schools and Libraries Universal Service

Support Mechanism, April 23, 2003)(footnotes omitted, emphasis added).

Once USAC approves a discount payment to an applicant, it sends out a Form

472 (BEAR Form) Notification Letter to the applicant school district and the service

provider informing them that the reimbursement has been approved and the amount of

the reimbursement. USAC does not send service providers a separate check for each applicant's discount, rather, a single check is sent which includes funds owed to several different applicants. The specific amounts to be passed on to each applicant are spelled out in the Notification Letters.

In short, the BEAR form is used when an applicant school or library overpays the total amount owed for the goods and/or services provided (the applicant's actual bill owed to the service provider, plus the discount to be remitted from USAC) to the service provider. The applicant and service provider then jointly submit the BEAR Form to inform USAC of the reimbursement amount. Upon receipt of the funds from USAC, the service provider is required to remit the funds to the applicant within 20 (formerly 10) days.

On June 22, 2007, USAC issued a BEAR Notification Letter for payment of plaintiff Whitmore Lake Schools' service discount in the amount of $5,767.13. On October 3, 2006, USAC issued a BEAR Notification Letter for payment of plaintiff Howell Public School District's service discount in the amount of $54,842.50.[2] On May 11, 2007, USAC issued a BEAR Notification Letter for payment of plaintiff Greenville Public Schools' service discount in the amount of $12,702.18. USAC issued two BEAR Notification Letters for payment of Plaintiff Van Dyke Public School District's service discount in the amount of $27,577.46 (a letter dated May 11, 2005 in the amount of $24,983.04, and a letter dated June 29, 2007 in the amount of $2,594.42). On June

---

[2]Howell's Complaint alleges that it is owed $125,031.65 in E-Rate funds from Defendant; $70,189.15 for the 2004-2005 funding year, and $54,842.65 for the 2005-2006 funding year. At the hearing on these Motions, the parties indicated that USAC still holds the $70,189.15 payable for the 2004-2005 school year, and has not forwarded that amount on to Debtor for payment to Plaintiff Howell Public Schools.

22, 2007, USAC issued a BEAR Notification Letter for payment of plaintiff Oxford Area

Community Schools' service discount in the amount of $9,200.66.

In signing the BEAR Form 472 requests for reimbursement, Defendant

specifically acknowledged that it was obligated to remit the discount amounts to the

applicant schools districts  within 10 days of receiving them, and that it had to remit

payment to the applicants prior to making use of the funds.  The BEAR Notification

Letters sent to the parties by USAC  included the following language reminding

Defendant of its obligations with respect to the discounts:

> The applicant has completed this Form 472 with your assistance, **seeking reimbursement of the discounted portion of bills already paid in full to you** since the effective date of the discount.
>
> The SLD [Schools and Libraries Division of USAC] has processed the Form 472.  **Pursuant to the Service Provider Acknowledgment page of the Form 472, which you signed, you <u>must</u> remit to the applicant the amount shown as "Total Amount of Reimbursement Approved for Payment" above, no later than 10 calendar days after receipt of payment of the approved discounts from USAC.**  You also agreed not to tender or make use of the payment of the approved discounts issued by USAC to you prior to remitting the discount to the applicant.
>
> The USAC check should be mailed to the service provider named above within 20 calendar days of the date of this letter.
>
> To reimburse the "Total Amount of Reimbursement Approved for Payment," to the applicant, the service provider may (1) issue a check or (2) issue a credit to the applicant.  The decision as to which form the reimbursement should take should be a mutual one between the service provider and the applicant.

(BEAR Notification Letters, attached to Plaintiffs' Complaints, emphasis added).

The parties agree that Defendant received and cashed check(s) from USAC

which included the discount amounts owed to Plaintiffs.  Defendant admits that it did

not remit the funds to Plaintiffs prior to filing a voluntary chapter 11 bankruptcy petition

9

on August 15, 2007.  Defendant listed Plaintiffs on Schedule F as a unsecured creditors.

Plaintiffs filed the present adversary complaints on October 18 and October 22, 2007.  Plaintiffs contend that the funds Defendant received from USAC belong to Plaintiffs, are not property of Defendant/Debtor's bankruptcy estate, and should be immediately paid back to Plaintiffs.  Further, Plaintiffs allege that they are entitled to treble damages because Defendant appropriated the funds through conversion, embezzlement or fraud.  Plaintiffs also assert that by retaining the money, Defendant breached a fiduciary duty owed to Plaintiffs.

According to Defendant, the check(s) it received from USAC, which included the discount amounts for services provided to Plaintiffs, also included discounts relating to other customers.  (Defendant's Response Briefs at 2).  The check(s) were payable solely to Defendant and "did not have any restrictive endorsements."  (Debtor's Briefs at 2).  Defendant deposited the check(s) into its operating account, an account "used by the Debtor to make substantially all of its disbursements.  This is also the account into which on-line payments, credit card payments and other electronic payments from customers are deposited.  As a result, the proceeds of the [USAC] check[s] were commingled with other funds" (Defendant's Briefs at 3), and are, according to Defendant, property of the bankruptcy estate.  Defendant also contends that under the BEAR Form Notification Letters it received regarding the discount payments owed to Plaintiffs, it "had the option of either issuing a payment to Plaintiff[s] in the amount of the Discount, or issuing a credit to Plaintiff[s] in that amount."  (Defendant's Briefs at 2).  Thus, Defendant argues that its possession of the money beyond the 10 day payment

10

period is permissible, and that commingling the funds makes the funds property of the estate.

Defendant filed its chapter 11 bankruptcy petition after receiving the funds from USAC, but before it paid the funds owed to Plaintiffs. The primary issue before the Court is whether the funds belong to Plaintiffs or are part of Defendant/Debtor's bankruptcy estate.

## II. Jurisdiction

Bankruptcy courts have jurisdiction over all cases under title 11 and all core proceedings arising under title 11 or arising in a case under title 11. *See* 28 U.S.C. §§ 1334 and 157. Core proceedings include proceedings on matters concerning the administration of the estate. 28 U.S.C. § 157(b)(2)(A).

## III. Standard for Summary Judgment

Fed. R. Civ. P. 56(c) for summary judgment is incorporated into Fed. R. Bankr. P. 7056(c). Summary judgment is only appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of

material fact." *Celotex*, 477 U.S. 317, 323. A "genuine" issue is one where no reasonable fact finder could return a judgment in favor of the non-moving party. *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). Once the movant meets this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts. If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the non-moving party, the motion should be granted." *Cox v. Kentucky Dept. of Transportation*, 53 F.3d 146, 149-50 (6th Cir. 1995) (internal quotation marks and citation omitted).

The Court may enter summary judgment in the absence of a cross-motion, if otherwise appropriate. *Century Offshore Mgmt. Corp. v. BMO Financial Incorporated*, 119 F.3d 409, 412 (6th Cir. 1997); See also, *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Ledford v. Tiedge (In re Sams)*, 106 B.R. 485 (Bankr. S.D. Ohio 1989); *Dickeson v. Quarberg*, 844 F.2d 1435, 1444 n.8 (10th Cir. 1988).

## IV. Analysis

Plaintiffs' Complaints allege several grounds for relief. The primary issue before the Court is addressed in Count II of the Complaints. That issue is whether the reimbursements paid to Defendant by USAC are property of Defendant's bankruptcy estate. The Bankruptcy Code defines property of the estate broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983). Section 541 specifically excludes from the estate "any power that the debtor may exercise solely for the benefit of an entity other than the debtor" (11 U.S.C. §

12

541(b)(1)), as well as "[p]roperty in which the debtor holds, as of the commencement of the case only legal title and not an equitable interest. . . " (11 U.S.C. § 541(d)).[3]  In the present case, Plaintiffs contend that the funds held by Defendant are not property of the estate because Defendant has no interest, legal or equitable, in the funds.

This Court is not the first to address the nature of USAC reimbursement payments in the context of bankruptcy.  *City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*, 329 F.3d 204 (1st Cir. 2003) is directly on point.  In *Lan Tamers*, the city of Springfield entered into two contracts with LAN Tamers to install a high speed data network in several schools.  LAN Tamers completed both jobs, and the city paid LAN Tamers in full.  The city received funding commitment letters from USAC (pursuant to the E-Rate program), and submitted, along with LAN Tamers, the BEAR paperwork for reimbursement of the prepaid discount totaling over one million dollars.  Before USAC forwarded the check to LAN Tamers, LAN Tamers filed for bankruptcy.  The city filed an adversary proceeding seeking the funds, but was met with objections from debtor LAN Tamers' other creditors, who argued that the funds belonged to the estate.  The bankruptcy court held that the reimbursements were not property of the estate, "but were held by [debtor] LAN Tamers in either a resulting trust or a constructive trust for the benefit of Springfield."  *LAN Tamers*, 329 F.3d at 209.  While the district court

---

[3]Section 541(d) excludes:
Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

13

affirmed the bankruptcy court, the First Circuit Court of Appeals affirmed, but rejected the lower court's reasoning.

The appellate court rejected the lower courts' characterization of the provider, LAN Tamers, as a trustee of the funds owed to the city, and instead held the debtor to be a "mere delivery vehicle, [which] lacked an equitable interest in the reimbursements under the federal program." *LAN Tamers*, 329 F.3d at 214 (footnote omitted). In concluding that the money held by USAC was not property of the estate, the Court of Appeals looked to the nature of the federal program from which the debtor's interest arose, focusing on three things: (1) the role the debtor was intended to play in the payment chain (*Id.* at 211), (2) "the degree and intensity of regulatory control over the property in question" (*Id.* at 212), and (3) "the extent to which recognizing a greater ownership interest - and thereby diverting the property in question to the creditors– would thwart the overall purpose of the regulatory scheme" (*Id.*).

With respect to the first issue, the debtor's role in the payment chain, the court found that the regulatory structure of the E-rate program clearly relegated LAN Tamers to the status of a mere pass-through. The court noted that "LAN Tamers signed an acknowledgment stating as much and foregoing any beneficial interest in the funds." *Id.* at 212. The court's analysis included cases in which other court's "have classified debtors as mere delivery vehicles even when the nature of the ''pass-through' under a government program is less obvious than" the E-rate program. *Id.* at 211-12. *See e.g. In re Joliet-Will County Community Action Agency*, 847 F.2d 430 (7th Cir. 1988).[4]

_____

[4]As explained in *LAN Tamers*, the *Joliet-Will* case, involved efforts by a federal agency to claim the unexpended balance of federal grant funds and property bought with grant funds from the estate

14

With respect to the second issue, the "degree and intensity of regulatory control over the property in question", the court found that the E-Rate program placed far more restrictions on the debtor's use of the property than permitted debtor's in other pass-through cases (such as *Joliet-Will County).* The court stated:

> Under the BEAR payment method, LAN Tamers has absolutely no freedom to do anything with the reimbursements except forward them to Springfield within ten days. LAN Tamers was explicitly barred from 'tendering or making use of' the payment from USAC before Springfield was reimbursed. In addition, other aspects of the E-Rate program, including the registration of service providers and the multi-layered approval process for projects, display a comparable or greater degree of regulatory control.

*LAN Tamers*, 329 F.3d at 211-12.

With respect to the third issue, the extent to which recognizing a greater ownership interest in the funds by a debtor (thus diverting the property to creditors) thwarts the purpose of the regulatory scheme, the court stated,

> [I]t is clear that Congress intended money from the USF to pay only for certain very specific activities. *See* 47 U.S.C. § 254(e)(USF funds shall be used 'only for the provision, maintenance, and upgrading of facilities and services for which the support is intended'). LAN Tamers has already been paid for the eligible services it provided; allowing USF funds to pay its other debts would violate this congressional mandate.

*LAN Tamers*, 329 F.3d at 212. The court went on to note that,

---

of a bankrupt private nonprofit community service agency, and thus to prevent distribution of this property to creditors. The court looked to the nature of the federal government's interest in the property, expressed through the regulation and the nature of the grantor-grantee relationship. *Id.* [*Joliet-Will*] at 432. *Joliet-Will* expressly noted that this federal interest does not preempt the [bankruptcy] Code– a recipient of federal money can declare bankruptcy– but it may affect the issue of who owns the property. *Id.* [*Joliet-Will]* at 433.
*LAN Tamers*, 329 F.3d at 210.

> [T]his conclusion also prevents the creditors from receiving a windfall of
> double payment for work LAN Tamers completed in Springfield's schools.
> If LAN Tamers had not filed for bankruptcy, it could hardly sue USAC in
> its own right to be paid again, having received full payment for its services
> from Springfield long before.  **Once USAC issued the check to LAN
> Tamers, the company could not have diverted the funds to its
> creditors or to other purposes without 'facing enforcement action.'
> At most, LAN Tamers arguable would hold bare legal  title to the
> reimbursements for a short time**.  It is a fundamental principle of
>  bankruptcy law 'that the estate can only succeed to the same property interest
> that the debtor possesses, and cannot achieve a greater interest ' . . . A
> conclusion that the reimbursements should be distributed to the creditors
> would flout this basic premise.  It would provide a windfall to the creditors
> at the expense of Springfield's public schools and its students contrary to
> the dictates of the statutory and regulatory text underlying the E-Rate
> program.

*LAN Tamers*, 329 F.3d at 212-13 (citation omitted, emphasis added).

This Court finds the *LAN Tamers* opinion to be well reasoned, persuasive, and applicable to the case at bar.  The funds sought by Plaintiffs in the present case arise from, and are controlled by, the statutory scheme analyzed in *LAN Tamers*.  Pursuant to the First Circuit Court of Appeals' analysis,  this Court finds that the reimbursement funds paid by USAC to Defendant in the present case, like the funds at issue in the *LAN Tamers* case, are not property of the bankruptcy estate, and belong solely to Plaintiffs–the entities the statutory scheme was intended to benefit.

Defendant/Debtor's creditors have no right to these funds and these funds cannot be used to fund the Debtor's Plan of Reorganization.  Debtor had a mere possessory interest in these funds when Debtor filed for bankruptcy.  Debtor did not have equitable title to the funds and they are not property of the estate.

Defendant's Response Briefs to Plaintiffs' Motions for Summary Judgment characterizes Plaintiffs' argument that the funds are not part of the estate as an argument seeking imposition of a constructive trust.  (Defendants' Briefs at 6-11).

16

While Plaintiffs acknowledge that "the status of the USF funds is similar to a trust in many respects" (Plaintiffs' Briefs at 11), Plaintiffs expressly dismiss the notion that the funds are held in trust and argue instead that "the funds belong only to the District pursuant to federal regulations. . . and as only the District has an equitable interest in the funds, in accord with 11 U.S.C. 541(d), the funds are not part of the bankruptcy estate." (Plaintiff's Brief at 11). The Court agrees.

It is important to differentiate between the statutorily protected reimbursement of funds to a school district who has prepaid **in full** an obligation to a debtor telecommunications company, and a constructive trust which a creditor seeks to impose to improve its position under the Bankruptcy Code's priority scheme. As fully discussed above, every aspect of the relationship between a school district and its telecommunications provider is governed by § 254 of the Telecommunications Act of 1996 (47 U.S.C. § 254). That section provides that a school district receives discounted telecommunication services, but it receives its discount, essentially, in the form of a rebate. The district pays the non-discounted bill in full to the telecommunications provider. The telecommunications provider and the school district together notify USAC that the bill has been paid by filing a BEAR form. USAC then pays the discount owed back to the school district by funneling it through the telecommunications provider. The provider MUST remit the discount owed to the school district within twenty days of receiving the funds from USAC.

Defendant ignores both the statutory framework of the Telecommunications Act of 1996 and the *LAN Tamers* case, and argues that Plaintiffs must establish that the funds were impressed with a constructive trust in order to obtain a right to recover that

is superior to other creditors. Relying on *SL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d.1443 (6th Cir. 1994), Defendant contends that Plaintiffs cannot establish a constructive trust. In the *Omegas* case, the Sixth Circuit Court of Appeals held that a creditor who had extended credit to a debtor was not entitled to the imposition of a constructive trust based on the debtor's alleged fraudulent pre-petition acts. Imposition of a constructive trust would have excluded the property from the estate, effectively circumventing "the Code's equitable system of distribution." *Omegas*, 16 F.3d at 1453. The court explained:

> The [Bankruptcy] Code recognizes that each creditor has suffered disappointed expectations at the hand of the debtor; for this reason, it makes maximization of the estate the primary concern and entitlement to shares of the estate secondary. Imposing a constructive trust on the debtor's estate impermissibly subordinates this primary concern to a single claim of entitlement.

*Omegas*, 16 F.3d at 1452-53.

Plaintiffs' relationship with Debtor in the case at bar is entirely different than the relationship between a creditor and a debtor in the constructive trust cases cited by Defendant. While Plaintiffs in the instant case are owed money by Debtor, Plaintiffs' right to payment is controlled by the Telecommunication Act of 1996, not the Bankruptcy Code.[5] Plaintiffs never extended credit to Defendant, and Defendant never had any right to use the money it received from USAC on Plaintiffs' behalf. Its sole duty with respect to the funds was to pass them through to the applicant school district. Debtors other creditors could not garnish or attach the money. Plaintiffs' money is in

---

[5]On December 19, 2007, one day before the claims bar date, Plaintiffs filed claims against Debtor's estate, presumably, to protect themselves in the event of an adverse ruling from the Court on the present Motions. The Court does not view the filing of these claims as conceding that the E-Rate funds are property of the estate.

18

Defendant's possession solely because of the statutory scheme for payments established by the Telecommunications Act. Unfortunately, Defendant filed for bankruptcy before Plaintiff had an opportunity to enforce its rights under the statute.

Defendant distinguishes the *LAN Tamers* case from the case at bar by noting that at the time LAN Tamers (the service provider) filed for bankruptcy, USAC still had possession of the funds and had not yet paid them over to LAN Tamers. In the case at bar, USAC sent checks (which included Plaintiffs' reimbursement funds) to Defendant, which Defendant cashed prior to filing for bankruptcy. Defendant argues that because it cashed the USAC checks and commingled the reimbursement funds with other money in its bank account, the funds lost their nature as E-Rate funds and became Defendant's property.[6] The act of merely depositing funds into a bank account does not alter the Court's analysis in determining the nature of Defendant's interest in the funds. It is quite clear from Defendant's signature on the BEAR form that Defendant understood that it had no ownership interest in the funds. Defendant's mere possession of the funds and commingling the money in a general operating account does not make the funds property of the estate as property is defined by 11 U.S.C. § 541(d).

Debtor was a conduit, created by statute, through which Plaintiffs' discounts flowed from USAC. Debtor's decision to ignore the statute does not alter the nature of the funds and render them property of the Debtor's estate. To accept Defendant's argument would relegate Plaintiffs to the status of general unsecured creditors. Plaintiffs would receive the same treatment through Defendant's plan as other

---

[6]In support of this proposition, Defendant cites trust cases in which a debtor commingles trust funds with non-trust funds. (Debtor's Briefs at 18-20). Because E-Rate funds are not held in trust, those cases are inapplicable.

unsecured creditors– creditors who Defendant proposes to pay in full over five years.[7]

As explained above, Plaintiffs' right to payment arises under and is controlled by

federal statute; the right to payment is not controlled by the priority scheme of the

Bankruptcy Code. Plaintiffs have paid Defendant in full, and the money owed to

Plaintiffs by USAC was never property of the estate. To allow Defendant to fund its

Plan of Reorganization by diverting funds from the pipeline between USAC and Plaintiff

completely subverts the Telecommunications Act of 1996.

Because the E-Rate reimbursement funds paid by USAC to Defendant are not

property of Defendant's bankruptcy estate, the funds must be returned to Plaintiffs.

Summary judgment is granted in favor of Plaintiffs on Count II of the Complaint.

## Conversion under MCL 600.2919a (Count I)

Count I of Plaintiffs' Complaints allege that Defendant's failure to turn over the E-

Rate funds constitutes conversion of Plaintiffs' property and entitles them to treble

damages.

---

[7]Defendant/Debtor filed a Proposed Plan and Disclosure Statement on February 15, 2008. The Plan states in relevant part:

> 3.5 <u>Class V</u>. This Class shall consist of the Allowed Unsecured Claims against the Debtor, including Deficiency Claims, but excluding Claims of Mr. Champagne, and excluding the Claims in Class VI. The Debtor estimates that this Class is owed in excess of $643,204.00. This class is impaired.

> 3.5.1 The Allowed Claims of this Class shall be paid in full in equal monthly installments of principal and interest commencing ninety (90) days after the Effective Date and continuing on the same day of each month thereafter for a period of five (5) years.

Whether Defendant's proposed plan is feasible pursuant to 11 U.S.C. § 1129 will be determined at the hearing on confirmation.

Under Michigan common law, the tort of conversion "is any distinct act of dominion wrongfully exerted over another person's personal property in denial of or inconsistent with the rights therein". *Foremost Ins. Co. v. Allstate Ins.* Co., 439 Mich. 378, 391 (1992). "The measure of damages for [common law] conversion is the fair market value [of the property converted] at the time of the conversion." *Baxter v. Woodward*, 191 Mich 379, 386 (1916), *citing Hautala v. Dover*, 176 Mich. 366 (1939); *Ehman v. Libralter Plastics, Inc.*, 207 Mich. App. 43, 45 (1994). Michigan also has a conversion statute. Liability under the statute gives rise to treble damages. The statute provides:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
>> (a) Another person's stealing or embezzling property or converting property to the other person's use.
>>
>> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.
>
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

Mich. Comp. Laws § 600.2919a.

In the present case, there are genuine issues of material fact regarding whether Defendant's possession of the E-Rate funds constitutes conversion. While the funds came into Defendant's possession lawfully (as a "conduit" or "pass-thru" pursuant to statute), Defendant had, by statute, 10 days in which to pass the funds through to Plaintiffs. Retention of the funds beyond 10 days gives rise to a claim that the

21

Defendant's possession is a "distinct act of dominion wrongfully exerted over" and "inconsistent with" the Plaintiffs' rights to possession of the funds. Whether retention of the funds was "wrongful" on the eleventh day or became "wrongful" at some later point depends on the circumstances between the parties at the time–circumstances which are not clear from the present record.

Because there are genuine issues of material fact regarding conversion, summary judgment is denied on Count I.

## Fraud, Embezzlement and Larceny: Counts IV and V

In Counts IV and V of Plaintiffs' Complaints, Plaintiffs allege that Defendant appropriated E-Rate funds belonging to Plaintiff through fraud, embezzlement, or larceny.

Under Michigan law,

> The general rule is that to constitute actionable fraud, it must appear: (1) that defendant made a material misrepresentation; (2) that is was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.

*Hi-Way Motor Co. V. International Harvester Co.*, 398 Mich. 330, 336 (1976).

Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982)(quoting *Moore v. United States*, 160 U.S. 268, 269 (1895). "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor

22

appropriated the property for a use other than that for which it was entrusted, and the circumstances indicated fraud." *In re Kindrick*, 213 B.R. 504, 508 (Bankr. N.D. Ohio 1997).

"Larceny can be defined as the actual or constructive taking away of property of another without the consent and against the will of the owner or possessor with the intent to convert the property to the use of someone other than the owner." *Rowe Oil, Inc. V. McCoy (In re McCoy)*, 189 B.R. 129 (Bankr. N.D. Ohio 1995)(citing *Black's Law Dictionary*, 6th ed. 1991). "As distinguished from embezzlement, the original taking of the property must be unlawful." *Davis v. Kindrick (In re Kindrick)*, 213 B.R. 504, 509 (Bankr. N.D. Ohio 1997)(citing *Collier on Bankruptcy*, § 523.10[2], 523-76 (15th ed. rev. March 1997). Larceny is commonly understood to be synonymous with theft. For example, larceny occurs when a thief breaks into a home and steals jewelry for the purpose of converting it to cash for his/her own use.

Having reviewed the pleadings and the record in this case, the Court finds no basis for fraud, embezzlement, or larceny. These claims are not plead with any specificity, and the Court finds nothing in the record to support a finding of intent to defraud which is a requirement for claims of fraud, larceny and embezzlement. Defendant is entitled to summary judgment on those claims and Counts IV and V are dismissed.

**Fiduciary Duty and Defalcation: Count III**

Count III of Plaintiffs' Complaints allege that Defendant's failure to remit the E-Rate funds to Plaintiffs constitutes defalcation and breach of fiduciary duty.

To establish a breach of fiduciary duty, the plaintiff must demonstrate a fiduciary relationship between [itself] and defendant[]. 'A fiduciary

23

> relationship arises from the reposing of faith, confidence, and trust, and
> the reliance of one upon the judgment and advice of another.' *Ulrich v.
> Federal Land Bank*, 192 Mich.App. 194, 196; 480 NW2d 910 (1991), *see
> also Beaty v. Hertzberg & Golden P.C.*, 456 Mich. 247, 260; 571 NW2d
> 716 (1997). 'Relief is granted when such position of influence has been
> acquired and abused or when confidence has been reposed and
> betrayed.' *Vicencio v. Ramirez*, 211 Mich.App. 501, 508; 536 NW2d 280
> (1995).

*Holland v. Jobete Music Co., Inc.*, 1999 WL 33446487, *2 (Mich.App.). The Sixth

Circuit Court of Appeals has defined defalcation "as encompassing embezzlement, the

'misappropriation of trust funds held in any fiduciary capacity' and the 'failure to

properly account for such funds.'" *Captiol Indemnity Corp. v. Interstate Agency, Inc. (In

re Interstate Agency, Inc.)*, 760 F.2d 121, 125 (6th Cir. 1985).

In the present case, Plaintiffs have not demonstrated the existence of a fiduciary

relationship or duty between themselves and Defendant. As explained above,

Defendant's duty to pass the E-Rate funds to Plaintiffs arose pursuant to federal statute

which neither states nor implies the existence of a fiduciary duty on the part of the

provider. Defendant is entitled to summary judgment on the breach of fiduciary duty

claim and Count III of the Complaint is dismissed.

## **V. Conclusion**

For the foregoing reasons, Plaintiffs' Motions for Summary Judgment are

granted as to Count II. Because there are no genuine issues of material fact as to

counts III, IV, and V, Defendant is entitled to summary judgment on those claims and

they are dismissed. Because there are genuine issues of material fact regarding

conversion, summary judgment is denied on Count I.

The Court is mindful of the impact of this decision. The Court's ruling requires

24

Debtor to segregate $ 110,089.93 and pay that money over to Plaintiffs.[8]  It is unclear from Debtor's financial statements whether Debtor has an ability to comply with this Court's ruling.  Unfortunately for Debtor, that reality does not change the law; Debtor has no right to use Plaintiffs' money to fund its day to day operations or to fund its repayment of other creditors through a plan of reorganization.  Plaintiffs are entitled to repayment of their money in full.

Signed on February 29, 2008

                                    /s/ Marci B. McIvor
                              Marci B. McIvor
                              United States Bankruptcy Judge

---

[8]This amount does not include $23,410.50 in E-Rate funds owed to West Branch- Rose City Area schools in Adversary Proceeding No. 07-6286, or $ 70,189.15 allegedly owed to Howell for the 2004-2005 school year but still held by USAC.

25